## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SARAH LINDSAY,

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

     *Defendant*.

_____/

CASE NO. 2:21-cv-10136

HON.  DENISE PAGE HOOD
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 20, 23)

### I.  RECOMMENDATION

Plaintiff Sarah Lindsay challenges the Commissioner of Social Security regarding a final decision denying her claim for Supplemental Security Income ("SSI"). The case was referred to the undersigned for review.  (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3).  For the reasons below, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 16), and **GRANTING** the Commissioner's motion (ECF No. 20).

### II.  REPORT

#### A. Introduction and Procedural History

On August 16, 2018, Plaintiff applied for SSI, alleging disability as of August 25, 2011. (ECF No. 12, PageID.15, 183).  She later amended the alleged onset of disability date to March 1, 2017.  (*Id.* at PageID.199).  She alleges disability due to Chiari

malformation, POT's Syndrome, vertigo, anemia, anxiety, depression, chronic migraine headaches, occipital neuralgia, and hypothyroidism.[1]  (*Id*. at PageID.204).

Following the denial of the claim at the initial level, Plaintiff requested a hearing, held on January 14, 2020 before Administrative Law Judge ("ALJ") Earl Ashford (*Id*. at PageID.78, 108, 118).  Plaintiff, represented by attorney Adam Banton, testified. (*Id*. at PageID.82).  On January 23, 2020, a vocational expert ("VE") responded to the ALJ's January 14, 2020 vocational interrogatory (*Id*. at PageID.249-252, 254-257).  The VE provided supplemental responses on May 15, 2020 (*Id*. at PageID.301-308).

On June 8, 2020, ALJ Ashford found that Plaintiff was not disabled. (*Id*. at PageID.61-71).  On November 17, 2020, the Appeals Council denied review of the administrative decision.  (*Id*. at PageID.47-49).  On January 20, 2021, Plaintiff filed for judicial review of the administrative determination.  (ECF No. 1).

---

[1] "A Chiari malformation is a problem in which a part of the brain (the cerebellum) at the back of the skull bulges through a normal opening in the skull where it joins the spinal canal. This puts pressure on parts of the brain and spinal cord, and can cause mild to severe symptoms." https://www.hopkinsmedicine.org /health/conditions-and-diseases/chiari-malformation-type-i.   (Last visited May 23, 2022). A Chiari malformation can cause headaches and "affect neuromuscular function, causing limb weakness or difficulties with walking or breathing." *Id.*

The condition of postural orthostatic tachycardia syndrome ("POTS") "affects blood flow. POTS causes the development of symptoms -- usually lightheadedness, fainting and an uncomfortable, rapid increase in heartbeat -- that come on when standing up from a reclining position and relieved by sitting or lying back down." https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots#. (Last visited May 23, 2022).

The American Association of Neurological Surgeons ("AANS") defines occipital neuralgia as a condition "in which the occipital nerves, the nerves that run through the scalp, are injured or inflamed. This causes headaches that feel like severe piercing, throbbing or shock-like pain in the upper neck, back of the head or behind the ears." https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Occipital-Neuralgia.  (Last visited May 23, 2022).

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means - and means only - 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that

disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021); *see also Heston v. Comm'r of Soc.*

*Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden

of proving the existence and severity of limitations caused by [his or] her impairments and

the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 16, 2018. (ECF No. 12, PageID.63). At step two, the ALJ found the following impairments severe: "Chiari malformation status post-sub occipital craniotomy; migraines with headaches with cephalgia with occipital neuralgia; essential hypertension; hypothyroidism, unspecified; generalized anxiety disorder with panic disorder; and major depressive disorder, mild." (*Id.*). The ALJ found that the conditions of POT's Syndrome "vertigo with syncope" and iron deficiency anemia were non-severe. (*Id.* at PageID.63-64). At step three, he found that none of the impairments met or

medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at PageID.64).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:[2]

> [P]ostural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Frequent balancing, stooping, kneeling, crouching and crawling. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Work limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any work-place changes. Occasional interaction with the general public, coworkers, and supervisors.

(*Id.* at PageID.66).

At step four, the ALJ found that Plaintiff had no past relevant work.  (*Id.* at PageID.70).   At step five, the ALJ cited the VE's testimony in support of his determination that Plaintiff could perform a significant number of jobs in the national economy including exertionally light, unskilled work as a sorter, packer,

---

[2] 3

Under 20 C.F.R. § 404.1567(a-d) *sedentary* work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and exertionally *heavy* work as "involve[ing] lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

and inspector. (*Id.* PageID.71). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.*).

### E. Administrative Record

#### i. Medical Evidence[3]

Records from an April 2017 neurological evaluation by David Lustig, D.O. note that Plaintiff underwent two Chiari decompression surgeries in 2011 and 2012, respectively. (*Id.* at PageID.391). Plaintiff reported chronic headaches, left-sided numbness, and a "bluish discoloration of [the] hands." (*Id.*). She exhibited a depressed affect with neck tenderness but an otherwise unremarkable sensory and neurological state. (*Id.* at PageID.392). In July 2017, Holly S. Gilmer, M.D. performed an injection of the right lesser occipital nerve to alleviate the reported headaches. (*Id.* at PageID.394-396). Dr. Gilmer's physical examination was wholly normal. (*Id.*). August 2017 records note Plaintiff's report that the injections decreased the headache severity between 40 and 60 percent. (*Id.* at PageID.398). A physical examination was unremarkable. (*Id.* at PageID.398-400). In November 2017, Plaintiff underwent an external neurolysis "resection of [the] right lesser occipital nerve." (*Id.* at PageID.419, 421). Records from the following month state that Plaintiff "had a wonderful result" from the procedure and was able to return to school. (*Id.* at PageID.418).

---

[3] Medical evidence pertaining to Plaintiff's condition prior to the application date of August 16, 2018 is included for background purposes only. *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993)(for an SSI claimant, period under consideration begins on application date).

In March 2018, Plaintiff reported double vision and "floaters." (*Id*. at PageID.411). A physical and cognitive examination was unremarkable. (*Id*. at PageID.41-412). In April 2018, she underwent an external neurolysis for resection of the left lesser occipital nerve. (*Id*. at PageID.423, 674). Post-operative records from the same month note her report that the headaches were "gone" but that she experienced pain at the incision site. (*Id*. at PageID.401). She exhibited a normal range of neck motion. (*Id*. at PageID.672).

In September 2018, Plaintiff sought emergency treatment for "drainage" from the April 2018 incision and reported that over the past week the headaches had returned. (*Id*. at PageID.464). She noted that her surgeon was unable to see her until the following month. (*Id*.) A physical examination was normal. (*Id*. at PageID.464-466). Neurological examination records from the following month note Plaintiff's report that she felt "fine" and denied incision site discharge. (*Id*. at PageID.514-516).

In November 2018, Robin Mika, D.O performed a non-examining review of the medical evidence, finding that Plaintiff could lift and/or carry 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation. (*Id*. at PageID.98-99). Dr. Mika found that Plaintiff could perform postural activity frequently, with the exception of only occasional climbing of ramps/stairs and a preclusion on the climbing of ladders, ropes, or scaffolds. (*Id*. at PageID.99). She found that Plaintiff should avoid all exposure to hazards such as machinery and heights. (*Id*. at PageID.100). In support of her determination, Dr. Mika cited medical records showing a full range of motion in all extremities, full motor strength, and a normal gait. (*Id*.).

November 2018 neurological records state that an appointment for the previous July had been rescheduled because Plaintiff "had to work." (*Id*. at PageID.483). Psychologist Alvin E. Lake, III, Ph.D., noted that Plaintiff did "very well with headache control since her occipital neurolysis" at the beginning of 2018. (*Id*.). Plaintiff reported an improvement in headaches and that she was currently taking math and general psychology classes and planned to take courses for a nursing degree. (*Id*.). She reported that she gave up a job as a restaurant hostess when "lifting a large tea set . . . opened [] one of her incisions" from the April resection surgery. (*Id*.). Dr. Lake noted that Plaintiff was applying for SSI, observing that "it is possible she could apply for Social Security based on [Chiari malformation.]" (*Id*.). He nonetheless noted that "she could still work when she feels she can find something she is able to do without damaging her incisions." (*Id*.). He encouraged her to drive short distances. (*Id*. at PageID.484). Plaintiff reported that she continued her relationship with her boyfriend and was focused on "getting a job and working as a nurse." (*Id*.).

In December 2018 psychologist Gayle Oliver Brannon, Ph.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's report of anxiety and depression along with the medical conditions including hypothyroidism, occipital neuralgia, anemia, low blood pressure, migraines, tachycardia, and vertigo. (*Id*. at PageID.545). Plaintiff reported the psychological symptoms of sadness, crying jags, anxiety, depression, nervousness, excessive worrying, and weekly panic attacks. (*Id*.). She admitted that she was able to care for her own needs, and "depending on" how she felt, could perform light household chores, shop, and attend school part time. (*Id*.).

9

Dr. Brannon observed a normal stream of mental activity, thought content, and memory. (*Id*. at PageID.546). She recommended "stress management," along with continued care for the physical conditions. (*Id*. at PageID.547). She concluded that "the pressure of employment would be a major factor in decompensation on [Plaintiff's] part and [she] does not present as a viable candidate for employment." (*Id*.). She noted that "if employment is considered some restrictions may be needed." (*Id*.).

In January 2019, James Tripp, Ed.D. performed a non-examining review of the records pertaining to the psychological conditions, finding that due to the conditions of depression and anxiety, Plaintiff experienced moderate limitation in the ability to concentrate, persist, or maintain pace but otherwise mild limitation. (*Id*. at PageID.96). He found that she could "do simple work with sustainability and persistence" with "occasional contact with coworkers, supervisors, and the public." (*Id*. at PageID.102).

In April 2019, Robert Starace, Ph.D. performed an updated non-examining evaluation of the mental health-related evidence, concluding that the newer records "continue[d] to support the conclusion that [Plaintiff] can understand/remember and execute simple tasks, can sustain [concentration, persistence, or pace] for simple tasks, can socially interact adequately and can adapt to changes in a limited contact setting." (*Id*. at PageID.552). He found "no additional" evidence to support the conclusion that her condition had worsened since Dr. Tripp's earlier evaluation. (*Id*.). The same month, Jose Rabelo, M.D. found that the evidence created in the past four months did not support greater physical limitation than found in Dr. Mika's November 2019 review. (*Id*. at PageID.553).

10

In June 2019, Plaintiff reported improved headaches. (*Id*. at PageID.645). November 2019 examination records by Jose Ricardo Compean, M.D. note the presence of "stable" hypothyroidism. (*Id*. at PageID.632). He noted that symptoms were alleviated by medication. (*Id*.). Plaintiff denied weakness. (*Id*.). Dr. Compean noted the condition of anemia but that Plaintiff denied symptoms. (*Id*.). She reported three to four headaches each week, each lasting between one and two hours. (*Id*.). She reported that the symptoms were relieved by Excedrin and "quiet/silence and darkness." (*Id*. at PageID.632). Symptoms of depression were deemed "chronic and stable," moderately limiting her ability to socialize and be motivated. (*Id*. at PageID.633). Plaintiff reported neck pain upon turning her head with a limited range of neck motion and paresthesias of the left hand and left foot. (*Id*.). The conditions were exacerbated by lying down for extended periods. (*Id*.). She exhibited decreased rotation of the neck and bending but full muscle strength. (*Id*. at PageID.634).

The same month, Dr. Compean completed a medical source statement, noting a "fair" prognosis as a result of Chiari malformation, depression, neck pain, and anemia. (*Id*. at PageID.663). He noted that symptoms included headaches, sadness, fatigue, and neck pain. (*Id*.). He found a decreased range of motion and lateral bending. (*Id*.) He noted that surgery had been "[without] benefit." (*Id*.). He found that she was incapable of even "low stress" jobs. (*Id*. at PageID.664). He found that she would require unscheduled breaks of uncertain length "depending on stress." (*Id*. at PageID.665). He concluded that Plaintiff would be required to miss work about two days each month "for appointments and stress." (*Id*. at PageID.666).

In November 2019, Plaintiff opined that her depression was controlled and that the condition only "moderately" affected her "socializing and being motivated." (*Id*. at PageID.632). She exhibited full flexion and extension of the cervical spine with decreased rotation and decreased left lateral bending. (*Id*. at PageID.635).

### ii. Plaintiff's Testimony at the Administrative Hearing

Plaintiff offered the following testimony:

She was 24, stood 5'7", and weighed 145 pounds. (*Id*. at PageID.82). She held a driver's license but limited her driving to short, occasional, local trips due to concentrational and physical limitations. (*Id*.). She was unable to lift heavy items and experienced chronic headaches. (*Id*. at PageID.83). She could walk for one block before taking a rest and was able to stand up to 45 minutes. (*Id*.). She was able to sit for up to one hour. (*Id*. at PageID.84). She could squat but was unable to bend. (*Id*. at PageID.83). She was right-handed. (*Id*.). Her neurosurgeon had imposed a lifting restriction of 10 pounds. (*Id*. at PageID.84). Her hands sometimes went numb. (*Id*.). She experienced nighttime sleep disturbances. (*Id*.). She napped for approximately one hour every day due to headaches. (*Id*. at PageID.85).

Plaintiff did not require help showering or bathing but left the bathroom door unlocked so she could be helped in case she fainted. (*Id*. at PageID.85). She was able to perform household tasks on a slow basis. (*Id*.). She no longer read for pleasure because her migraine headaches "mixed up" the words. (*Id*. at PageID.85-86). The incense burned at church services caused migraine headaches. (*Id*. at PageID.86).

Plaintiff was able to follow a recipe.  (*Id.*).  She took naps to quell migraines around five times a week.  (*Id.* at PageID.87).

### iii.  The Vocational Expert's Proffered Testimony

In April 2020, VE James Fuller responded to a vocational interrogatory by the ALJ describing a hypothetical individual of Plaintiff's age, education, and work history:[4]

> [L]ight work . . . except postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs.  Frequent balancing, stooping, kneeling, crouching, and crawling. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any work-place changes. Occasional interaction with the general public, coworkers, and supervisors.

(*Id.* at PageID.303).  The VE stated that the above limitations would allow for the exertionally light, unskilled work of a sorter, *Dictionary of Occupational Titles* ("DOT") code 526.687-010 (220,000 positions in the national economy); packer, 559-687-074 (200,000); and inspector, 222.687-042 (100,000).  (*Id.* at PageID.304). In response to an interrogatory by Plaintiff's attorney, the VE stated if the above-described individual were off task for 15 percent or more of the workday, or took two or more absences a month, all full-time employment would be precluded.  (*Id.*

---

[4] The hypothetical question and VE's responses discussed here are limited to the question and responses forming the basis of the RFC and step five job numbers found in the administrative opinion.  (*Id.* at PageID.66, 71).

at PageID.308). He stated that his testimony was consistent with the information found in the DOT and his own profession experience. (*Id*. at PageID.307).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

    (i)     A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency

in the State in which he or she practices, or hold a Certificate of
Clinical Competence in Speech-Language pathology from the
American Speech-Language-Hearing Association;

(6)    Licensed audiologist for impairments of hearing loss, auditory
processing disorders, and balance disorders within the licensed scope
of practice only [];

(7)    Licensed Advanced Practice Registered Nurse, or other licensed
advanced practice nurse with another title, for impairments within his
or her licensed scope of practice []; or

(8)    Licensed Physician Assistant for impairments within his or her
licensed scope of practice [].

20 C.F.R. §§  404.1502(a), 416.902(a). (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State
and working within the scope of practice permitted under State or Federal law, or an
individual who is certified by a State as a speech-language pathologist or a school
psychologist and acting within the scope of practice permitted under State or Federal law."
*Id.* §§ 404.1502(d), 416.902(a).

In contrast, a nonmedical source means "a source of evidence who is not a medical
source."  *Id.* §§ 404.1502(e), 416.902.   "This includes, but is not limited to: (1) [the
claimant]; (2) Educational personnel (for example, school teachers, counselors, early
intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and (4) Family members,
caregivers, friends, neighbors, employers, and clergy."  *Id.*

The SSA "will not defer or give any specific evidentiary weight, including
controlling weight, to any medical opinion(s) or prior administrative medical findings,
including those from your medical sources."  *Id.* §§ 404.1520c(a), 416.920(a).  "The most

15

important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* §§ 404.1520c(c)(3), 416.920c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* §§ 404.1520c(c)(4), 416.920c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* §§ 404.1520c(c)(5), 416.920c(c)(5).  "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding

makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1)

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of [these sections], as appropriate." *Id.* The regulations reiterate that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of these sections) and consistency (paragraph (c)(2) of these sections) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). As such, the SSA "will explain how we considered the supportability and

consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3)

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* §§ 404.1520c(d), 416.920c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c" or 416.920c. *Id.* §§ 404.1520b(c), 416.920b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether

you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii)   Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];
>
> (iii)  Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];
>
> (iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];
>
> (v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and
>
> (vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* §§ 404.1520b(c), 416.920b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* §§ 404.1504, 416.904. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

20

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* §§ 404.1502(f), 416.902(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* §§ 404.1502(g), 416.902(g).  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* §§ 404.1502(c), 416.902(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* §§ 404.1529(a), 416.929(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* §§ 404.1529(a), 416.929(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id*.  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA notes that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* §§ 404.1529(c)(3), 416.929(c).   This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern

of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*   The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."   *Id.* §§ 404.1530(a), 416.930(a).   Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you

23

benefits." *Id.* §§ 404.1530(b), 416.930(a). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)  The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)  The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)  The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)  The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* §§ 404.1530(c), 416.930(c).

### F.  Arguments and Analysis

Plaintiff argues that the RFC crafted by the ALJ did not adequately account for how the conditions of Chiari malformation and migraine headaches affected her ability to perform sustained work. (ECF No. 16, PageID.696-705). In an interspersed argument, she contends that the ALJ failed to consider the impact of medication side effects on her work abilities. (*Id.* at PageID.701). She asks for the Court to reverse the ALJ's determination for an award of SSI or alternatively, a remand to the administrative level for further proceedings.

In turn, the Commissioner argues that substantial evidence supports the RFC assessment and step five determination that Plaintiff could perform a significant range of work in the national economy. (ECF No. 20, PageID.729-740). The Commissioner

disputes Plaintiff's position that the ALJ is required to provide "an explicit discussion of medication side effects." (*Id*. at PageID.734).

### a. SSR 19-4p

Plaintiff argues that the RFC failed to account for her limitations resulting from migraines, headaches with cephalgia, and occipital neuralgia as required by SSR 19-41p, 2019 WL 4169635, at *7–8 (August 26, 2019).  (ECF No. 16, PageID.698).

SSR 19-4p states in relevant part:

> If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's [RFC]. We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. . . . We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

SSR 19-4p, at *7–8 (Aug. 26, 2019).

While primary headache disorder is not a listed impairment, it is analyzed under Listing 11.02B or 11.02D, the "most closely analogous listed impairment[s]." *Id.,* at *7.  SSR 19-4p continues in relevant part:

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its

> treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* (citing 20 C.F.R. Part 404, Subpt. P, App. § 11.02 (Mar. 14, 2018)).  SSR 19-4p then describes the requirements of the D paragraph of the same listing.

> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*Id.*

Plaintiff's contention that the ALJ did not apply the correct standard for analyzing the headaches; failed to provide adequate reasons for discounting the professed degree of limitation resulting from the headaches; and/or, that substantial evidence does not support the RFC for a significant range of light work is not well taken.  As a threshold matter, the ALJ cited SSR 19-4p in discussing the allegations of disabling headaches/migraines.  (ECF No. 12, PageID.65).  In keeping with the requirements of SSR 19-4p, he acknowledged that the conditions were properly analyzed under the "most closely analogous listed impairment of 11.02, paragraphs B or D," finding that the medical evidence did not show that Plaintiff met either paragraph of the Listing.  (*Id.*).  He noted that she did not experience marked limitation understanding, remembering, or applying information; interacting with

others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  (*Id*. at PageID.63-64).

The ALJ also provided a thorough explanation for declining to craft a more restrictive RFC.  He acknowledged the 2011 and 2012 surgeries for the Chiari malformation and the November 2017 and April 2018 occipital nerve resection procedures.  (*Id*. at PageID.67).  He noted that a March 2017 CT of the head reflected the Chiari procedures and that her condition was stable.  (*Id.*).  He noted that Plaintiff reported good results from both resection procedures, and after April 2018 stated that the headaches had ceased.  (*Id.*).  He noted that September 2018 records showed only mild headaches.  (*Id.*).  He noted that she walked and used an elliptical machine for exercise; attended school part time; and opined that she could work so long as the surgical incisions were not damaged.  (*Id.*).  He cited a treating recommendation to exercise 150 minutes each week.  (*Id.*).

The ALJ's findings are supported by my own review of the record. December 2017 records note a "wonderful" result from the first resection surgery. (*Id*. at PageID.418).  Following the second resection surgery in April 2018, Plaintiff reported that her headaches were "gone." (*Id*. at PageID.401). She exhibited a normal range of neck motion.  (*Id*. at PageID.672).  While in September 2018 she reported drainage from the incision site of the April 2018 procedure, a physical examination was normal.  (*Id*. at PageID.464-466).  The following month, she denied drainage and reported that she felt "fine." (*Id*. at PageID.514-516).  Even assuming that the incision drainage precluded all work between April and October 2018, the condition

would not meet the 12-month durational requirement for an award of SSI.  20 C.F.R. § 416.905(a).  November 2018 records state that the headaches were well controlled. (*Id*. at PageID.483).  Plaintiff's treating psychologist observed she had ceased work earlier in the year due to an incision opening after heavy lifting, but noted that Plaintiff believed she could hold a job where she was not at risk of damaging the incisions.  (*Id*.).  Treating notes from June 2019 note Plaintiff's reports of improved headaches.  (*Id*. at PageID.645).  While Plaintiff cites treating records noting distorted vision, loss of consciousness, light sensitivity, and the need to recline on a daily basis, five of the six citations significantly predate the relevant period beginning on August 16, 2018.  (ECF No. 16, PageID.698) citing (ECF No. 12, PageID.391, 408, 447, 450, 453, 632).  Although in November 2019 Plaintiff reported three to four headaches each week lasting for one to two hours, the treating records show no acute distress and full orientation.  (*Id*. at PageID.632-635). Moreover, the ALJ acknowledged the November 2019 exam records, citing the treating recommendation to exercise 150 minutes every week.  (*Id*. at PageID.69, 636).

Because the ALJ correctly applied the law in evaluating the headache/migraine allegations and his findings are well explained and supported, a remand on this basis is not warranted.

28

### b.  The Subjective Complaints

More generally, Plaintiff contends that the ALJ erred by discounting her allegations of limitation.  (ECF No. 16, PageID.697).  Aside from the above-discussed arguments regarding the headaches/migraines, she contends that the ALJ failed to consider the prescribed medication side effects; the need to take unscheduled breaks and/or excessive absenteeism; and limitations in "neck flexion, rotation, and extension." (*Id*. at PageID.701-705).

SSR 16–3p sets forth the standard for evaluating a claimant's professed limitations using a two-step process. 2016 WL 1119029, at *3 (Mar. 16, 2016). First, the ALJ determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id*.  Plaintiff does not challenge this aspect of the ALJ's determination.

Second, an ALJ must evaluate the claims of limitation not reflected in the objective evidence. *Id*. at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *4.  In evaluating the claimant's allegations, the ALJ must consider, among other things, the "type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms."  20 C.F.R.  §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

Plaintiff's argument that the ALJ failed to consider the medication side effects is based on a November 2018 report that she felt "somewhat foggy with Topamax."[5] (ECF No. 12, PageID.483).   To be sure, the administrative decision contains no mention of medication side effects.   However, while under §§ 404.1529(c)(3), 416.929(c)(3), the ALJ was required to consider effect of medication side effects, he was not required to discuss them in his determination.   "[T]he requirement that the ALJ consider allegations of medical side effects does not mandate their explicit mention in the written decision." *Stec v. Comm'r of Soc. Sec.*, 432 F. Supp. 3d 719, 727, 2020 WL 109507 (E.D. Mich. 2020).   The ALJ's statement that he gave "consideration" to the evidence presented "and allegations regarding 'the intensity, persistence and limiting effects' of the conditions is sufficient to address the claims of medication side effects."  *Id.* (citing *French v. Commissioner of Social Sec.*, 2016 WL 3951419, at *13 (E.D.Mich. June 30, 2016); *adopted*, 2016 WL 3924111 (E.D. Mich. July 21, 2016)).   Likewise, here the ALJ stated that he had considered Plaintiff's statements regarding "the intensity, persistence, and limiting effects" of her symptoms.  (ECF No. 12, PageID.67).

Plaintiff's argument that the medication side effects were not considered is further undermined by the fact that the ALJ comprehensively discussed the same November 2018 treating records at two points in his decision.  He noted that Plaintiff appeared fully oriented and was currently taking two classes.  (*Id.*).  He cited the treating psychologist's opinion that Plaintiff could work and that she could drive short distances.  (*Id.* at PageID.67-68).

---

[5] Plaintiff did not allege medication side effects in her application for SSI.  (ECF No. 12, PageID.227).

Given the ALJ's extension citation to the same record that Plaintiff relies on, there is no reasonable basis to conclude that he did not consider her statement that Topamax made her "somewhat foggy." Aside from the issue of whether the alleged medication side effects were properly considered, the treating psychologist's belief that Plaintiff had the wherewithal to drive, work, and take courses in preparation for becoming a nurse, despite her allegation of "fogginess," supports the conclusion that she could perform a significant range of unskilled, simple, routine, repetitive, and non-assembly line work as set forth in the RFC.  (*Id*. at PageID.66).

Further, the ALJ did not err in declining to credit Plaintiff's professed need for unscheduled breaks and an average of more than one absence a month.  He acknowledged her testimony that she needed to nap frequently and experienced concentrational problems. (*Id*. at PageID.66).  However, he cited treating records showing that one month into the relevant period, she reported only mild headaches.  (*Id*.).  He observed that she was able to remember her medications, attend college, sustain a romantic relationship, drive, take care of her own personal needs, read novels, and drive.  (*Id*. at PageID.64-65, 67-68).  He cited the treating source psychologist's opinion that Plaintiff was capable of working.  (*Id*. at PageID.66).  *See Bondarenok v. Comm'r of Soc. Sec.*, No. CV 19-12480, 2020 WL 5415231, at *7 (E.D. Mich. July 13, 2020), *report and recommendation adopted,* No. CV 19-12480, 2020 WL 5370198 (E.D. Mich. Sept. 8, 2020) (The plaintiff's ability to engage in a wide variety of activities and communicate effectively, coupled with good results from prescribed medication, supported RFC for unskilled, full-time work). While Plaintiff argues on a related note that the ALJ failed to consider her ability to work on a "sustained"

31

basis as required by SSR 85-15. (ECF No. 16, PageID.705), SSR 85-15 applies to cases "involving the evaluation of solely nonexertional impairments." 1985 WL 56857, at *2 (1985). In contrast here, the ALJ found both exertional and non-exertional impairments arising from Plaintiff's physical and psychological conditions.  Moreover, even if SSR 85-15 were applicable to the facts of this case, the ALJ's finding that Plaintiff possesses the psychological ability to perform full-time unskilled work is supported by substantial evidence.

Finally, Plaintiff faults the ALJ for declining to include a limitation in neck rotation in the RFC.  (ECF No. 16, PageID.703).  The record does contain treating observations of a limitation in neck rotation and neck pain.  (ECF No. 12, PageID.634, 663).  However, two non-examining experts opined in November 2018 and April 2019 respectively that Plaintiff did not experience significant limitations in neck movement.  (*Id*. at PageID.98-99, 553).   While substantial evidence supports a finding of *no* neck-related limitation, the ALJ acknowledged the presence of some degree of upper body limitation by limiting Plaintiff to lifting 20 pounds and frequent (as opposed to *constant*) bilateral reaching, handling, and fingering.  Accordingly, the ALJ did not err in declining to impose a greater degree of physical limitation in the RFC.

Because the ALJ's rejection of Plaintiff's alleged degree of limitation is supported by the record and well explained, it is entitled to the deference of this Court. *See Cruse v. Comm. of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (An ALJ's assessment of claimant's allegations entitled to "great weight") (*see also Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(ALJ's conclusions

regarding the subjective claims "must stand unless 'patently wrong in view of the cold record'").

### Conclusion

For these reasons, I recommend **DENYING** Plaintiff's motion, (ECF No. 16), and **GRANTING** the Commissioner's motion, (ECF No. 20).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file

a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 1, 2022                                          S/ PATRICIA T. MORRIS
                                                            Patricia T. Morris
                                                            United States Magistrate Judge